Okay, it looks like we are all set, so we can begin argument in our third and last case today, number 25-2003, Robinson v. NCAA. And Mr. Kilaru, we'll start with you. Thank you, Your Honor, and may it please the Court, Rakesh Kilaru for the NCAA. An antitrust case requires antitrust proof, and in this case, the District Court entered a mandatory preliminary injunction without requiring any. The plaintiffs in this case May, could I ask you just to start with mootness, just so we sort of establish our jurisdiction going in, and I've read your brief on this. So, as I understand this, the exception, or so-called exception for capable of repetition but evading review, it's sort of a categorical question, whether the action that's being challenged, I guess the denial of eligibility here, is by reason of its inherently short duration for remedy, the kind of action that would likely forever evade review. So, it does seem to me relevant that this precise action has been reviewed on appeal twice now. What do we do about that? Your Honor, I think that the key distinction there is the way in which the cases are now being litigated, this case in particular, and whether the way in which the case is being litigated would evade appellate review. We were fortunate to get decisions in the Third and Seventh Circuit, but that was because the plaintiffs in those cases filed suit on a pretty timely basis when they thought there might be an eligibility issue. So, I believe in those cases, the plaintiff filed in January or February prior to the season in which they were seeking to compete. Here, and this is the increasing trend in these cases, the plaintiffs filed their suit basically a day or two before the season started, which dramatically compressed the timetable for the issue to be capable of review and is going to defeat, we think, the court's jurisdiction to review the issue in this and every future case where things are filed so close to the time in which the season begins. And I think that it's relevant. I'm sorry, I'm just trying to get my hands around this. Is there a practical reason why we should expect plaintiffs to wait till the last minute? Well, I think, Your Honor, this case sort of illustrates why the longer you wait, the less likely there is that there's going to be appellate review of a decision in your favor. I'm not accusing the plaintiffs of doing anything. What if the decision is against you? Then wouldn't you want time for appellate review? I'm just not understanding the incentive structure here that means that plaintiffs will always wait till the last minute. Your Honor, I can just say descriptively there are 50 to 60 of these cases in the courts right now. And what we have seen over the course of the last year is that the time in which the suit is filed has gotten closer and closer to the season, which has a few effects. First, the judges believe in the district court that there's more of an immediate emergency, and so issue a decision very quickly. And win or lose, I think from the plaintiff's perspective, if they don't win immediately, the appellate review process probably isn't going to give them much of what they want anyway, because even the most expedited appellate review process will probably not get you the ability to compete in much of the season. On the other hand, if you prevail, the most likely outcome, as we've seen here, is that there won't be time for the case to be up on appeal. So you'll effectively get the benefit of competing for the entire season, and then the case will potentially be moved. So I'm just saying that that's descriptively what's happening. But I also think that the way the doctrine is described doesn't require that it be categorically capable of escaping review. I think you have to look at it under the facts and circumstances of the case. And here, I think we have a good example of how the case and the issue has evaded review. You know, we did have an injunction issued on August 20th. We tried to expedite the appeal. We've come to the court as quickly as we can, but now the season is over. And there's an argument that the case has moved as a result of that. We know this issue is recurring. I think the site we put across several different pages of our brief shows that this is an issue that continues to recur in the courts again and again and again. So it's clearly capable of repetition. And I think the facts of this case show how it can very easily evade review and how, you know, we might just find ourselves in the very same position at the start of the next season in the same court if more players are seeking eligibility. And just on that note, Your Honor, I think from our perspective as the NCA, the complaining party, we certainly think that the issue is evading review and is capable of repetition. But I think even if you look at it from the plaintiff's perspective, at least one of the named plaintiffs in this case is seeking a waiver to compete for another season. So there's every likelihood, I think, if that waiver continues, that request continues, that the judge would be in the position, excuse me, the district judge would be in the position of potentially entering the same exact injunction again at the start of next year. And then we find ourselves in this position again. Thank you. I think turning to the merits, if I could, Your Honor, an antitrust case does require some antitrust proof. And in this case, the district judge didn't require any of the plaintiffs on two of the most essential elements of an antitrust claim. And that's the relevant market and harm to competition. As Your Honors have seen, we've pressed in our arguments a brief that these rules are not commercial and thus outside the scope of the Sherman Act. And I'll return to that argument at the end if there's time. But I really do want to focus on this evidentiary issue because it's a really critical issue. And I think it's the one that the Third and Seventh Circuits have recently focused on incorrectly on pretty much the exact same record that you have here. In an antitrust case, and this comes from Alston, the plaintiff is supposed to come forward with economic evidence of current market realities. I'm quoting from the Alston decision where the court said that an antitrust assessment requires a careful, an antitrust decision requires a careful assessment of market realities. There is no question that the market in this case, the potential markets in this case have changed. You have the house antitrust settlement from a year and a half ago. You have new payments being made to student athletes consistent with that settlement. You have NIL opportunities being available to student athletes. All of this has happened since the Alston decision. And yet there is literally no evidence in the record in this case of what is happening with those market conditions and what they mean for the relevant market. And a concrete example of why that matters comes from the named plaintiffs. The plaintiffs in this case, and I believe this is actually the opening of their brief, say that they were considering going to the NFL until they thought that they might be able to get an additional season of college. That is in economic terms, a potential argument about substitution between collegiate and professional athletics. But there's no evidence in the record here of what the market is. And I think if you look at the record evidence here, you would see something that I don't think would pass muster in pretty much any antitrust case. There's a decision from Judge Boyd. I'm sorry. I was mooted. I'm sorry. No problem. Let me ask you about this. It looked to me like the judge did a quick look as opposed to a rule of reason or a more in-depth market analysis. We're talking big money here now. It doesn't matter where we're talking about Division I, Division II, Division III, JUCO. I mean, just Division I, it seemed to me to require more than a quick look and that the rule of reason should be applied in these cases. What's your position about that? We agree, Your Honor. We think that's another error that we found in the district court's opinion. And we mentioned this in our opening brief. There is a reference in the district court's opinion to evaluating the restraints at issue here, quote, in the twinkling of an eye, which is, Your Honor, I think notes is the traditional way that the quick look is described as opposed to the full rule of reason. And it is clear from the Alston decision that the rule of reason is how antitrust analysis is supposed to go forward here. And that's why I started where I started, which is the first step is looking at economic conditions in the relevant market. As Your Honor noted, those economic conditions are quite different than they were even from the Alston decision. But I think what was put in the record in this case was a textbook chapter from years before Alston, a Federal Reserve paper from years before Alston, the Alston decision itself, and then an expert report from a different case that just cited Alston as proof of the relevant market and is the exact expert report that the Third Circuit recently concluded was insufficient to support the antitrust claim as to the relevant market in a lot. It's literally the same report. It was Dr. Maxey's report in the allot case. So that's the report that was offered here. And that is the sum total of record evidence on the relevant market. There is no evidence on how compensation is playing out in college sports today. There's no evidence of substitution between junior colleges and Division One schools, no evidence of economic conditions in Division One sports and other athletic offerings. And as I mentioned, there's some evidence in this record that would complicate the view that college sports is a distinct market from other markets. So I think on the market issue, there's a glaring evidentiary flaw. But there's a separate flaw when it comes to the second antitrust element of harm to competition. It's a fundamental antitrust principle that courts have to look for evidence of harm to competition and not to individual competitors. Here, there's no question, I think, that the individual plaintiffs who sued believe they're being harmed. But that's not enough under the antitrust laws. A plaintiff coming in in an antitrust case has to show harm to the competitive process. So what do you look for? You look for reduced output in the claimed market. You look for some wage effect in the claimed market, evidence that the restraint is operating to lower wages. And once again, there's no evidence at all on that issue in this record. There's no evidence of wages being suppressed. In fact, a wage suppression theory doesn't really even make sense anymore, because under the house settlement, there is a cap on the spending schools can provide to players. So there wouldn't be increased compensation, no matter who comes into the labor pool, it's the same amount of money, it just gets divided among different players. And there's a decision from the Sixth Circuit, the NHL Players Association case, and I can provide a site for that in rebuttal if helpful, that essentially says, you don't look at quality of individual players when you're looking at a market wide assessment, what you look at is the market as a whole, and whether there's some effect in the market. And then in terms of output, there's the same number of spots in Division One football, regardless of who competes. So there's not an increase in output in the number of available spots if these students are allowed to compete versus they're not. It's just a displacement. Instead of high schoolers or underclassmen taking those spots, you have more experienced senior players taking those spots. So those are... Can I ask you a question? I understood at least one of the theories to be floating around here to be, I think what's known as a group boycott kind of a theory, like we are, what the Division One schools are doing is penalizing workers, basically, if they first work for a competitor, and that you do that to sort of consolidate your market position vis-a-vis the competitors. So basically, we're competing with these junior colleges. And if we penalize people for having first played at a junior college, we can squeeze them out. Why does that not work, at least kind of as a matter of common sense? There's, I think, a couple of different reasons why that doesn't work, Your Honor. The first is that a group boycott claim wasn't pleaded here. So it's not in the case. That's a specific type of antitrust claim. It wasn't pleaded or pressed here. Even if you get beyond that, there's an evidentiary problem. Even when someone asserts a group boycott, they still have to show some kind of effect in the market that's being created by the group boycott. What you typically would look for is evidence that because you are boycotting a certain type of labor, you're able to suppress wages or reduce output. It comes back to that same point. This is actually a colloquy that occurred, I believe I had it with Judge Hermendorfer in the Pavia case, and she mentioned it in her concurrence in that case. But there still needs to be some economic evidence of a wage effect or of an output effect, even when you're alleging a group boycott theory, which hasn't been alleged here. And there isn't any record evidence of that. There are assertions that junior college players would make more money in college sports if they were allowed to compete. But there's no evidence that that would actually happen. And what we know about facts in the real world suggests that theory is wrong, because there is a finite amount of money that teams have to spend on players. And so it's just a question of who gets that money, not the question of whether more money would be available if older players were allowed to compete in the same number of players competing in college sports, regardless of whether these students are allowed to compete or not. It's just an allocation of who gets to be in or who gets to be out. So we don't think the theory is pleaded, but even if it was pleaded, we don't think there's evidence to support it. I think the last thing to just note here, Your Honor, before I think saving time for rebuttal unless there's further questions, is that decisions like the one below do effectively bring the courts into this role of actively supervising pretty much every potential eligibility decision that the NCA could make. This is something that was raised in Judge Lepar's concurrence in the Pavia decision. Should the GPA rule be 2.8 or not? I think even if you look at the footnotes in the district court decision in this case, there is a question as to whether an academic eligibility rule, a rule that says there has to be a GPA requirement, whether that would be permissible. Setting aside the commercial argument, which we stand by, but I think if Your Honors are not willing to accept that argument, at least the rule needs to be the rule of reason applies to all of these rules. So that invites a huge amount of judicial superintendents, but it also then would require evidence. And so what we would suggest and submit, Your Honor, is that similar to what the Third and Seventh Circuits have ruled, if we're coming forward and bringing an antitrust claim under the rule of reason to challenge NCA eligibility rules, you need to come forward with the antitrust evidence of harm to competition and of what the relevant market should be. Counsel, I completely understand your argument. I mean, we are up on a preliminary injunction, right? So I think we have to draw a line here. You need something, you need some evidence, but you obviously, I think you would agree, but tell me if I'm wrong. You don't need what you need, like in an antitrust trial where you'd have like a whole bunch of witnesses and like, I don't know, a lot of statistical evidence and so forth. So I guess my concern about your argument would be I don't want to write an opinion that makes it impossible for anyone ever again to prevail on a preliminary injunction if they can't show everything they're going to need to know, show to prevail. So what are we talking about here? I think the easiest way to write that opinion, Your Honor, would respectfully be to do with the third and seventh circuits did, which is say you can't have nothing. I know that doesn't answer the question of what the something would be, but I do think that if you look at the record here, there's clearly nothing. There's not even an expert report submitted in this case or any economic analysis submitted in this case. And so that should be, I think, a complete answer here. The question of how much evidence one needs to establish a likelihood of success in a preliminary injunction proceeding is obviously a thorny one that I know the court's grappling with in a number of other cases. I think in an antitrust case, I wouldn't purport to suggest that the court suggests some bright line rule, but I think there needs to be some attempt in an economic analysis of what's actually going on in the relevant market as opposed to just a citation to cases from years ago that did not address current market conditions. And there are many ways in which that evidence could be assembled. I would know that one way in which it could be assembled is to file the lawsuit earlier and seek discovery over the months that could be had. I mean, in this case, for example, the plaintiffs knew that they might be deemed ineligible as early as February of 2025. The lawsuit wasn't filed until August of 2025. But if the lawsuit's filed in February, a plaintiff can ask the court to proceed over expedited discovery, get evidence of what's going on in the current market, get evidence of what's going on from a compensation perspective, and try to put together something that would be sufficient evidence for preliminary injunction. What I don't think the law allows is to come forward with pretty much nothing and say that because it's a P.I. posture, that nothing is enough. If there are no further questions, Your Honor, I'd ask for a rebuttal for three minutes, but thank you very much. Okay. And then Mr. Giannola, we'll hear from you. Yes, Your Honor. John Giannola for the plaintiff appellees, and may it please the court. Real, maybe not briefly, but I would like to address mootness first. We believe that this matter before this court is moot. We don't think there's a live case or controversy. The preliminary injunction was directed solely to these players, to this season. It does not apply. The season is over. Obviously, we cannot go back in time and undo any mistakes. We don't think it's capable of repetition either. Let me ask you about that because I think it's interesting that one of the players has already filed for a waiver as to the same issues as in this case. So how, I mean, what's your best argument that it's not capable of repetition? I will confess I was not involved in his filing of another waiver. So I have not seen it. My understanding is that that player was injured this year. So I assume that his waiver actually has to do with the red shirt rules and not with the JUCO rules that this case applied to. I'm happy to be corrected by the NCAA's counsel if they know differently, but I do not believe that there's a separate waiver that is actually, or at least I don't have any reason to believe that there's a separate waiver addressing these exact issues because I think that would go to an injury or red shirt of some variety and not what we have litigated here before. Some of these plaintiffs did have red shirt waivers, but that was not an issue in this case. But when, I mean, I think if you look at the years and the years and the, and if we look at the years that they, I guess, were the JUCO, I mean, there is a possibility that they could still make the same argument regarding the years of eligibility, the seasons and the years of eligibility, at least two or three of them. I think that they could raise that. I agree with you. I don't know that we have. I think that that would be possible. I don't know that it would be foreclosed. It has not been made yet though, and it is certainly not a part of this, this injunction. I think to do that, they would have to go back to the district court and get some other kind of order. And presumably that would involve another hearing and another set and another evaluation by that court. I think the sixth circuit addressed this in its PAVIA decision. Finding that moot is, I think, I don't litigate in the circuit court of appeals often, but I think the case or controversy before us here is this specific preliminary injunction. So I agree with your honor that they could do that. I don't know that that would keep this alive because I think that would be a different order related to different people and have different findings. Well, in this case, this Mr. Edwards has been playing football since 2019, and two or three years of it was JUCO. So don't you think it's about time that these cases, when you exceed five years playing football, that maybe we all decide whether it is a Sherman antitrust problem with the NCAA? How can you say this case is moot when this guy's played since 2019 and three of those years were JUCO? Yes, your honor. I think these cases presented a unique fact pattern because A, the NCAA issued a waiver in December of 2024 related to Mr. PAVIA. That decision set into motion a whole lot of decisions on these clients to withdraw from the NFL. And then on top of that, in June of 2025, you had the house settlement, which sort of reconfigured college sports and certainly sort of changed a lot of these dynamics. So I personally agree with your honor that these, even these players have been around for a long time. This is a sort of unique set of facts that was kicked off by this waiver from the NCAA and then compounded by this house settlement. I would hope that those would sort of shake out, you know, in maybe this litigation and many of the other pending litigations. But this particular injunction was only for these players in these years. And I don't know that keeping this alive or ruling on it will affect any of those litigations. So we do not think it's capable of repetition. We also don't think that it's the same, the same complaining party could find itself in this despite Judge Benjamin's questions. We don't think that the same complaining parties would find themselves in this. And that's a vital question under this theory. You know, the sort of seminal case everyone cites to Spencer, the Kenma by the U.S. Supreme Court says that the interestingly named Fourth Circuit case, stop reckless economic instability versus the FEC, the Pavia case in the Sixth Circuit, all of those seem to point out that the same parties have to face this. We do not think these same parties will face these particular set of issues, certainly not under this injunction. And finally, we don't think the rule of restitution is in front of this court. So we don't think that that's something to be discussed. Moving on to substance, I would like to point out and tag along with something Judge Harris said. This is not a fully litigated case. This is not a fully litigated antitrust case. This is a preliminary injunction. The questions are whether my clients were likely to succeed, whether they're likely to suffer irreparable harm with the balance of the equity that I have. I don't think that's the case. I don't think and whether the injunction was in the public interest. To a certain level, I do not disagree with Mr. Kalaru. I think all of that evidence is certainly vital in an antitrust case. The cases he's pointing to, though, take I think the NHL case he cited took eight years to decide. That type of evidence takes a very, very long time to develop. And it is not possible and not practical to sort of require it on the front end on a preliminary injunction. So I think that's where we differentiate. If this were the end, if this were a decision on the merits, I do not disagree that that is the type of thing that we would need. But the idea is, but don't you I mean, the issue that appears to be here is that you have to understand that we're at the preliminary injunction stage, but you have to have some, some evidence. And it seems as if the district court relied on this Maxey report, Dr. Maxey report. And even in the Third Circuit, I mean, they said that it was insufficient. So you have to have something, right? Yes, Your Honor, you have to have something. I will agree it is not the world's most robust evidentiary case. We have a learned treatise that is evidence. We have here a report, which is admittedly hearsay by Dr. Maxey. Those are, we also have all of these other cases. And I understand those are not evidence, but they are indicia of our likelihood of success. So we have a scintilla, we have a little bit of evidence, we have enough to hang our hat on. We have then multiple indicia. We have all of these court cases acknowledging that there is a market. We have the house settlement in June where the NCAA agreed that there was a commercial market for athletics as part of that settlement. Now, I'm not saying that that's some sort of race judicata over here that they have, that they have, you know, foresworn any argument against a market, but those are all indicia of our likelihood of success of proving that there is a market. The court invited, the district court invited the supreme, I'm sorry, the district court invited the NCAA to opine on what the definition of a market should be to explain how to do it. They declined to do it. They said they could not do it. They needed an expert to do it. So the idea that they can now come back and say, oh, well, this, you've not defined this market. You didn't have evidence. We agree the evidence is light, but the indicia that we are likely to succeed on that, I believe is pretty strong. And so that is why we think that we have met that hurdle. I don't know that that would be enough at the end, but certainly at this stage when things are pressing, especially given I want to address the idea that we could have brought this complaint months earlier, the house decision did not come out until I think June 5th, maybe of this year that completely rewired college sports. It completely rewired the antitrust analysis because now with that settlement, there is revenue sharing. There are limits as Mr. Kalaru pointed out. So the idea that we could have done all of this sooner is just not really practical. One of the plaintiffs did not even get his waiver. So on a quick level how this worked, our clients went and applied through the NCAA's internal system to seek a waiver for this year. And their basis for that waiver was, look, we think you made a mistake when you granted this PAVIA waiver in December, you applied it to seasons and only and not two years for the calendar. So they were trying to comply with the NCAA's internal procedures. Those took, you know, they take months. The NCAA looks at those. So we, it is not that we foreswore or we waited on purpose to do this. As Judge Harris pointed out, there are severe downsides to waiting until the beginning of the season to file these. In fact, one of our plaintiffs suffered, he could not play. I think all of the clients missed several weeks of practice. One of them couldn't play any games because he had had some other delays in getting practice. So there is no real, there was no delay on the plaintiff's side. It was just trying to grapple with this constantly changing landscape in college sports. So we think that- Can I just ask you a question? Putting to one side sort of the evidentiary support question, I couldn't figure out from the district court's opinion what theory of anti-competitive effect or harm it was adopting, just as a matter of logic. Like what did it think was the problem here? Can you just tell me sort of what's the anti-competitive, what is your theory of why there is an anti-competitive harm as a result of counting junior college years toward your total years playing? Yes. With regard to that specific effect, we think that- Isn't that what you're challenging? Did I ask the question wrong? I thought that was the in this case. You ought not count the years spent playing in junior college towards your total years playing. Is that not the question? It is the question. We would put a lot of nuance having read all, but that is the basic question. We would say that the NCAA has a monopsony power in the market on these. It is placing artificial and arbitrary restraints on these athletes, especially with regard to JUCO. We say JUCO, there's actually another league as well, NAIA. It is putting arbitrary restraints on those, and it is artificially depressing the labor market. It is used that to lower overall compensation to athletes. Okay. So that's your theory. It's not about competition with junior colleges for labor. That's not your theory. If the junior colleges would join me in this case, I would greatly appreciate it, but I don't know that my clients have standing to assert a theory like that on behalf of the junior colleges. Okay. So the only, this is very helpful to me because I think the district court was talking about competition with junior colleges, but you're not interested in that. The thing you are defending are the illusions to the idea that there might be wage depression in this market. Yeah. And let me clarify. I think there is some competition. Okay. This is the issue with this. The NCAA has a monopoly in broadcasting. Oh, sorry. I'm not supposed to move my hands. The NCAA has a monopoly in broadcasting and putting on exhibiting college sports. It has a monopsony in acquiring college athletes. To the extent it does compete with junior college on both of those fronts, it does sort of compete with the junior college in acquiring athletes. So I think that these restrictions, so we, in some regard, we also have a theory that by placing these restrictions on these athletes, it is discouraging them from attending junior college and encouraging them to attend the NCAA. So there are, I guess, two theories. One is they artificially- And what is the anti-competitive harm from bringing more players into Division I? Well, I think that sort of goes to the harm to JUCO, not necessarily- Right. Which you are not standing on. Right. Okay. All right. So let's forget that. Okay. Okay. So the one theory in this case is wage depression in the market. And the theory there, just like explain it to someone who's not a huge football fan, but the basic idea, as I understand it, is you're excluding people with more years of experience. They would be better. They would therefore be able to sort of generate bidding wars for their better talent. And because this is an atypical market, that would actually have more people in it would drive up the wages rather than drive them down. Is that the idea? I am not an economist, but I believe so, Your Honor. And I will just say as a sort of lunch-pail litigator, it terrifies me to be limiting my case right at the preliminary injunction stage. But at this point, all we're talking about is they are instituting these JUCO penalties. They are doing so to manipulate the labor market. And we believe that they are doing so to lower overall compensation. Okay. I just have a question about sort of the logic of the theory. And then I'll stop because I'm really struggling here. If that's the theory, it would apply to anyone who wants to play a fifth year, right? By limiting people to four years rather than five, you'd have the exact same argument whether or not that one year had been spent at a junior college. And that's the argument that shows up in the Seventh Circuit case, right? That guy didn't play junior college. He just wanted to play a fifth year. And so that's the theory they ran. Well, if you let five-year people in, that will actually push up wages because they'll be better and people will bid for these better players. There'll be wage competition that will benefit everyone. So I guess this sort of goes back to my very first question. If that's your theory of economic harm, why is this a case about junior college years rather than just a case about you able to limit people to four years? Well, in our case, I think the distinction and maybe it has been inartfully pled, but I've tried to sort of weave this throughout all of our briefs. We think the distinction in this case is that when the NCAA granted that blanket waiver following the Mr. Pavia decision, it implicitly admitted that it had no rational basis for preventing those junior college players from playing. So you're saying that once you shift the burden, they might have some like really good reason to only let people play four years in Division I, but not a good reason. Okay. So there might be different justifications. They would have the same anti-competitive effect, but one would be easier to justify than the other? I do think so, Your I think I'm going to use this as an example. I don't know why, you know, this slippery slope, I think it was Mr. Kehlaru referenced. I think that came up during the arguments in the Sixth Circuit in the Pavia case. Well, what about GPA? What about this? I have not studied it, but I presume that the NCAA would have very good reasons to do that. I think the issue here and why we all of this gets when they made that waiver, they said your seasons playing in junior college do not apply, but your years attending school do apply. And there's never been a reason, and I don't think they can offer a reason for why they should make that differentiation, other than there's just simply trying to keep people out. I think if you look, my guess is they have very good reasons for almost all of their rules. I think that that waiver, though, was so fundamentally bizarre to say that a season playing this sport doesn't count towards your eligibility playing the sport, but attending school in a non-NCAA institution does count, is just so fundamentally inexplicable for any reason that that would differentiate us from those other rules. Well, you know, I've sat here and listened to I don't know how many minutes of argument about all the things that are wrong, etc., and then you come in here and argue that this case is moot. My concern is we have a substantial portion of two of the five power conferences in this circuit, and I just don't particularly want these people running to some district judge and getting an injunction without some guidance from this court. And you, I don't know, I don't care what the outcome is. It's just a matter of getting the issues resolved. Apparently, you want it both ways. Well, Your Honor, I think it's moot. I do think that, but if you disagree, I'm going to argue, I'm going to present the substance. The issue is finding the preliminary injunction moot does not mean it's not going to be litigated below. I think in the Gloucester County School Board case, and I, of course, don't want to explain this court's opinions to itself, but I think this court provided very good, a very good explanation to the district courts on how to apply and how to for preliminary injunctions. So I think that that roadmap exists. I think in this case, we have a unique factual pattern that's not going to repeat. And so that's why I think it's moot. So I don't know that we need more guidance to the district court. I don't think I would ever say more guidance is bad. I just think that the case is moot and we can follow Gloucester County pretty well. And I think we did in this case. Okay. Well, thank you very much. And then we have a few minutes of rebuttal time. Thank you very much, Your Honors. On the mootness issue, I would just note to start the scope of the injunction that was issued in this case. It's quite broad. The judge precluded us from applying, quote, any NCAA eligibility rule that would preclude the plaintiffs from engaging in intercollegiate competition. It was limited to last season, but I think when you say any eligibility rule, it would fold in the issues that we may have with Mr. Edwards coming into next year. In terms of the injunction. Let me ask you this. So he says this case is similar to the Pavia, but the eligibility issues were different in that case. Is that correct? Your Honor, I think the answer is yes to that question in a couple of ways. So the underlying theory was the same. Mr. Pavia was saying his junior college years shouldn't count. So in that sense, it's the same. But the issue is different because in that case, the NCAA granted a waiver that allowed all of the students to play for the rest of the year. And so the court said, well, you have given a waiver that takes this issue off the table. So nothing we do is going to change the outcome. There wasn't a waiver given in this case. So actually, that's the key distinguishing factor for Pavia. But I thought the district court said you can't apply any immediately grant them waivers of any NCAA eligibility rule that would preclude them from engaging in sports based on their time spent at a junior college. I thought this was very junior college specific, which sort of goes to the question I had for your colleague about some of the theories here seem to well beyond whether you spend time at a junior college or not. Your Honor, I think the issue is that no matter how you come into a new eligibility issue next year, it's going to bottom out on the question of whether the junior college issue counts. So that's really why it's not moot. To answer your question, Your Honor, I think the problem we have here is really an injunction that's in search of a theory and in search of evidence. It's not clear to Your Honor's point from the decision itself what actual antitrust theory the judge was offering. I think that's in part because the judge applied the quick look to Judge Floyd's question earlier. If you look at JA 1135, the court said it's comfortable on the record at this juncture concluding in the twinkling of an eye that the challenged rules are restraints on trade. That's applying the wrong legal standards. So that alone is a basis for rejecting the claim. But if you get past the quick look issue and go to the theory that my colleague mentioned in his argument, you still need some proof of the relevant market and you need proof of the harm. And so the relevant market, there's nothing in this record that could be based on. The Elad decision, as Judge Benjamin noted, the report has already been conclusively rejected. There's nothing beyond that. And then on the theory of harm, I would just look to the court's, the Sixth Circuit's opinion in NHLPA, which is if I could finish 325 F third at 720. And it says that shifting the quality of players in a market isn't an anti-competitive harm. You need to show something more. And that's what was absent here. Um, can I ask you just a quick question about the Seventh Circuit opinion? And I can't pronounce the name, but I think it's Forker, but it took me a while to get there. Okay. In that case, I thought that court also rejected this theory of the wage suppression theory. The dissent advanced it and the majority said there's just literally no evidence in the record. And I guess I was, I have not gone back to look at the record in that case, but I wondered if you had any views about whether the record in this case is substantially better or whether if we were to endorse that theory, we would be splitting with the Seventh Circuit. I think it would create a circuit split, Your Honor. The record is a little different in that you have the Maxey report here and you didn't have it in Forker. But I think the Maxey report was really submitted in a different case. So whether it's even admissible here is a different question. But the logic of the Seventh Circuit's opinion applies with full force here. I think the court noted it typically doesn't make sense to say when you have more laborers in a market that that's a problem for wage suppression. It typically goes the other way. So you should need some evidence that suggests it's going in the other direction. And that's the evidence that's absent here. If there are no further questions, Your Honor, we'd ask that the judgment will be reversed. And we thank you very much for your time. Great. Thanks to both of you. We appreciate you arranging to be here remotely. We are sorry we cannot come down and greet you personally as is our custom. But we do hope that we will see you both soon and have an opportunity to do that. And I guess we will ask that our remote court be adjourned for the day. Thanks very much. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Pamela A. Harris, DeAndrea Gist Benjamin, Henry F. Floyd